**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

Kristin Gonzalez,

        Plaintiff,

Case No.: 2:06cv982

v.

Judge Michael H. Watson

Abercrombie & Fitch Co.,

        Defendant.

**OPINION AND ORDER**

Before the Court are the following:

The March 17, 2008 Motion of Abercrombie & Fitch Co. (hereinafter "Defendant")

for Summary Judgment (Docs. 19 and 20). Plaintiff Kristin Gonzalez (hereinafter

"Plaintiff") filed a Memorandum in Opposition on April 10, 2008 (Doc. 32). Additionally,

Plaintiff filed a Summary of Points and Authorities for Plaintiff's Memorandum in

Opposition on April 10, 2008 (Doc. 34). Defendant filed a Reply Memorandum on April

24, 2008 (Doc. 36).

Plaintiff filed the instant action asserting claims under the Equal Pay Act, 29

U.S.C. § 206 (d)(1), O.R.C. §§ 4111.17, 4112.02 and 4112.99. Plaintiff asserts

Defendant paid her less than two male employees, Greg Hollern and Daniel Cutright,

who performed equal work.

This matter is ripe for review. For the foregoing reasons, Defendant's Motion for

Summary Judgment is hereby **DENIED.**

## I.    FACTS

### A.    Plaintiff's Employment History with Defendant[1]

Upon graduating from college in 1993, Plaintiff began her accounting career with Arthur Andersen.  In November, 1996, The Limited, Defendant's former parent company, hired Plaintiff as an Analyst in the Accounting Department.   The Limited promoted Plaintiff to Senior Analyst and Accounts Payable Supervisor in 1997.

In May 1998, The Limited spun off Defendant as an independent publicly held company.  Thereafter, Plaintiff accepted a position as a Senior Accountant in the Financial Reporting Department with Defendant.  A summary of Plaintiff's positions, salary and awarded stock options while employed by Defendant is set forth in Exhibit A.

#### 1.    Manager of Financial Reporting

As Manager of Financial Reporting, Plaintiff was generally responsible for collecting, compiling and internally reporting financial information provided by others, which was used by senior management to analyze the performance of the business. Plaintiff managed between three to six associates.

#### 2.    Senior Manager of Financial Reporting

Many of Plaintiff's job responsibilities as Manager of Financial Reporting were still retained upon her promotion to Senior Manager of Financial Reporting.  However, she assumed expanded responsibilities associated with the assembly of the internal corporate income statement and balance sheet as Defendant opened new stores and

---

[1]Plaintiff's Complaint asserts that from May, 1998 to May 31, 2006, Defendant paid her a lower salary than it paid male employees for equal work (Doc. 2, ¶9).  However, during Plaintiff's deposition, counsel for Plaintiff represented that, based on the various statutes of limitations, the relevant time for the accrual of  Plaintiff's claims was November, 2002.  (Plaintiff's Depo. p. 16).  As such, the court shall consider Plaintiff's claims from November, 2002 until her voluntary termination in May, 2006.

launched new brands.  Another expanded responsibility was assisting in the

development of accounting policies and procedures for the planned launch of stores

internationally.

### 3.    Voluntarily Termination of Employment

In February 2006, Plaintiff went on maternity leave.  Upon returning from

maternity leave in May 2006, Plaintiff worked for a few days and then voluntarily

tendered her resignation.  Prior to leaving her employment, Plaintiff completed an exit

interview form.  On this form, Plaintiff indicated her satisfaction with her annual salary

and stock awards while employed by Defendant.

### B.    Greg Hollern's Employment History with Defendant

In September 1999, after eight years at Deloitte & Touche, Mr. Hollern was

initially recruited to work as Defendant's Manager of SEC Reporting.  A summary of Mr.

Hollern's positions, salary and awarded stock options while employed by Defendant is

set forth in Exhibit B.

### 1.    Manager of Accounting Operations, Sales Audit and Inventory Control

As the Manager of Accounting Operations, Mr. Hollern supervised between ten

to fifteen associates and was responsible for managing the areas of Sales Audit and

Inventory Control.

### a.    Inventory Control

One of Mr. Hollern's duties managing inventory control was being responsible for

all the transactional accounting around Defendant's inventory, as well as operational

control over the movement and processing of inventory through the supply chain to the

stores. To do so, he was required to work with Loss Prevention, Store Operations and outside vendors. Mr. Hollern managed approximately eight associates in inventory control.

### b.  Store Audit

Mr. Hollern also had responsibilities managing Store Audit, which required managing at least four employees. His responsibilities included, *inter alia*, preparing and reconciling the Daily Sales Report, seven days a week. Further, he was responsible for compiling, auditing and reporting sales information at each of the stores nationwide, managing expenses associated with the tender of cash, credit and gift cards, and managing and reconciling the bank deposits and accounts for each of Defendant's stores.

### 2.  Senior Manager of Sales Audit and Inventory Control

Mr. Hollern retained the same duties he had as Manager, the breadth of his responsibilities increased due to store expansion and the launch of new brands.

### 3.  Director of Store Control

As Director of Store Control, Mr. Hollern managed five associates. He was required to interact with senior company executives, such as the CFO, associates at all levels of Store Operations, such as District Managers, Regional Managers, store management, and Loss Prevention associates, and associates in other groups such as Store Maintenance and Purchasing. Additional duties included, inter alia, managing the yearly budget, the projected budget and other expenses associated with the stores for each of the Defendant's brands nationwide. Further, he produced financial information

dedicated to tracking income and expenses flowing through the stores, which were
ultimately provided to Plaintiff to assemble the income statement and balance sheet.

### C.    Dan Cutright's Employment History with Defendant

In August 2000, Defendant hired Mr. Cutright as a Senior Financial Analyst in the
Store Control group.   He previously worked as a manager in the finance division at the
Gap, Inc. in San Francisco, California.  A summary of Mr. Cutright's positions, salary
and awarded stock options while employed by Defendant is set forth in Exhibit C.

### 1.    Senior Financial Analyst

Mr. Cutright's position as Senior Financial Analyst required him to manage store
payroll by allocating hours to each store and for all brands based on factors such as
sales, inventory, and visual presentation.  This required Mr. Cutright to work with
approximately one hundred District Managers and seven Regional Managers
nationwide to assess the operational needs in the field and to coach these store
operations managers on how to run a store within the payroll hours available.  During
his tenure in this position, there was rapid store growth and the launch of new brands.
As a result, Mr. Cutright's responsibilities grew significantly.

### 2.    Senior Manager and Assistant Store Controller

As Senior Manager and Assistant Store Controller, Mr. Cutright interfaced with
upper-level management, other members of the Store Control, Store Operations and
Finance Groups and a variety of District Managers, Regional Managers, store
managers, and Loss Prevention personnel out in the field.  Mr. Cutright managed two
employees.  His responsibilities included, *inter alia*, managing a budget, ranging from

$166 to $225 million.  Additionally, he managed payroll hours for each of the stores

within all of the brands, which at the time included between 700 and 780 stores.

### 3.    Senior Manager of Sales Audit and Inventory Control

In September 2004, Mr. Cutright was promoted to Senior Manager of Sales Audit

and Inventory Control when Mr. Hollern was promoted to Director of Store Control.  Mr.

Cutright managed twelve employees and assumed all of the duties previously

performed by Mr. Hollern, as discussed above.   Moreover, as a result of store

expansion and the launch of a new brand, Ruehl, production of the daily sales report

became even more complex after he assumed the position from Mr. Hollern.

## II.    ANALYSIS

### A.    Summary Judgment Standard

The standard governing summary judgment is set forth in Fed. R. Civ. P. 56©,

which provides:

> The judgment sought shall be rendered forthwith if the pleadings,
> depositions, answers to interrogatories, and admissions on file, together
> with the affidavits, if any, show that there is no genuine issue as to any
> material fact and that the moving party is entitled to judgment as a matter
> of law.

Summary judgment will not lie if the dispute about a material fact is genuine; "that is, if

the evidence is such that a reasonable jury could return a verdict for the nonmoving

party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  Summary judgment

is appropriate, however, if the opposing party fails to make a showing sufficient to

establish the existence of an element essential to that party's case and on which that

party will bear the burden of proof at trial.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 322

(1986); *see also Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 588 (1986).

When reviewing a summary judgment motion, the Court must draw all reasonable inferences in favor of the nonmoving party, and must refrain from making credibility determinations or weighing the evidence. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150-51 (2000). The Court disregards all evidence favorable to the moving party that the jury would not be not required to believe. *Id.* Stated otherwise, the Court must credit evidence favoring the nonmoving party as well as evidence favorable to the moving party that is uncontroverted or unimpeached, if it comes from disinterested witnesses. *Id.*

Additionally, in responding to a summary judgment motion, the nonmoving party "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" *Id., quoting Liberty Lobby,* 477 U.S. at 257. The nonmoving party must adduce more than a scintilla of evidence to overcome the summary judgment motion. *Id.* It is not sufficient for the nonmoving party to merely "'show that there is some metaphysical doubt as to the material facts.'" *Id. quoting Matsushita,* 475 U.S. at 586.

Moreover, "[t]he trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Id.* at 1479-80. That is, the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact. *In re Morris,* 260 F.3d 654, 665 (6th Cir. 2001).

**B. Plaintiff's Affidavit**

Before beginning the examination of Plaintiff's Equal Pay Act claim, the Court will address the objection Defendant raised in its April 24, 2008 Reply Memorandum (Doc. 36) with respect to Plaintiff's Affidavit, which is attached as an exhibit to the April 10, 2008 Memorandum in Opposition (Doc. 32). The Court reviewed Plaintiff's affidavit and deposition testimony and concludes contradictions exist between the two. Moreover, the Court also concludes statements in the affidavit are too general, failing to provide specific facts. Nonetheless, the Court will not strike these portions of the affidavit because even without considering the statements set forth in the affidavit, the Court's analysis set forth below is unaltered.

**C. Equal Pay Act**

The Equal Pay Act (hereinafter "EPA" or "Act") prohibits wage discrimination "between employees on the basis of sex . . . for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." 29 U.S.C. § 206(d)(1). A plaintiff alleging a violation of the EPA must make a *prima facie* showing that the employer paid different wages to an employee of the opposite sex for substantially equal work. *See Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974). "Equal work" does not require that the jobs be identical, but only that there exist "substantial equality of skill, effort, responsibility and working conditions." *Odomes v. Nucare, Inc.*, 653 F.2d 246, 250 (6th Cir. 1981). Whether the work of two employees is substantially equal "must be resolved by an overall comparison of the work, not its individual segments." *Id.* A broad range of factors must be analyzed when comparing jobs:

> Whether two jobs entail equal skill, equal effort, or equal responsibility requires a practical judgment on the basis of all the facts and circumstances of a particular case. Skill includes such considerations as experience, training, education, and ability. Effort refers to the physical or mental exertion necessary to the performance of a job. Responsibility concerns the degree of accountability required in performing a job. Application of the Equal Pay Act depends not on job titles or classifications but on the actual requirements and performance of the job. In all cases, therefore, a court must compare the jobs in question in light of the full factual situation and the broad remedial purpose of the statute.

*EEOC v. Universal Underwriters Ins. Co.*, 653 F.2d 1243, 1245 (8th Cir. 1981), *cited in*

*EEOC v. City Council of Cleveland*, 875 F.2d 863 (6th Cir. 1989). Finally, the plaintiff

"bears the burden of establishing equality of the work performed and the skill, effort and

responsibility required to perform it." *Harrison-Pepper v. Miami Univ.*, 246 F.Supp.2d

854, 860 (S.D. Ohio 2003).

If the plaintiff satisfies the initial burden of establishing a *prima facie* case, the

defendant has the opportunity to show the wage differential is justified under one of the

four affirmative defenses set forth under § 206(d)(1) of the Act:

1. a seniority system;
2. a merit system;
3. a system which measures earnings by quantity or quality of production; or
4. any other factor other than sex.

*See Corning Glass Works*, 417 U.S. at 196. Because these nongender-based

explanations for the wage differential are affirmative defenses, the defendant bears the

burden of proof. *See id.* at 197; *see also Equal Employment Opportunity Comm'n v.*

*Romeo Community Schs.*, 976 F.2d 985, 988 (6th Cir. 1992).

Defendant limits its analysis in its motion for summary judgment to the *prima*

*facie* case. As such, the Court will only address whether Plaintiff establishes a *prima*

*facie* case of wage discrimination.

Moreover, the time-frame at issue is November, 2002 until Plaintiff's voluntary termination in May, 2006.  While Plaintiff's Complaint sets forth facts from 1999 until her voluntary termination, at Plaintiff's deposition, counsel for Plaintiff stated damages were not being sought for wage discrimination prior to November 2002.  Moreover, the parties, in briefing the motion for summary judgment, do not assert any arguments with respect to wages prior to November 2002.  Thus, while the Court set forth information above regarding the positions, salary and benefits of Plaintiff and Messrs. Hollern and Cutright prior to November 2002, it was only to give a complete factual development to this claim.  Accordingly, the Court shall limit its legal analysis to the November, 2002 to May, 2006 time-frame.

Upon consideration of the evidence[2], the Court concludes a genuine issue of material fact exists which renders summary judgment inappropriate at this time.  Based upon an examination of the evidence, comparing the work performed by Plaintiff to the work performed by Messrs. Cutright and Hollern, during the relevant time-period, leads the Court to conclude that Plaintiff's positions did not require equal effort and responsibility.  However, in applying the required summary judgment standard, the Court is unable to conclude the evidence presented by Plaintiff is such that a reasonable jury could not return a verdict for Plaintiff on the issues presented in the summary judgment motion.  The resolution of these issues is for the trier of fact, and not the Court,  especially since the credibility of witnesses will be at issue,

---

[2]The Court notes that it did not consider the testimony of Susan Riley in considering Defendant's Motion for Summary Judgment as it was taken after the briefing of the Motion.

**D.    Ohio State Law Claims**

O.R.C. § 4111.17 is Ohio's version of the EPA and Ohio courts apply the federal

standards to resolve claims pursuant to O.R.C. § 4111.17.  *See Creech v. Ohio*

*Casualty Insurance Co.*, 944 F.Supp. 1347, 1353 (S.D. Ohio 1996), *citing Stone v.*

*Greater Cleveland Regional Transit Authority*, 92 Ohio App.3d 373, 383 (1993).

Additionally, O.R.C. § 4112.02 is identical to Title VII of the Civil Rights Act of 1964, 42

U.S.C. § 2000(e) *et seq.*    Similarly, violations of O.R.C. §4112.02 are analyzed

pursuant to case law interpreting Title VII.  *Plumbers v Steamfitters Joint Apprenticeship*

*Commt v. Ohio Civ. Rights Comm.*, 66 Ohio St.2d 192, 196 (1981).  Moreover, Title VII

and EPA claims, based on the same set of underlying facts, are analyzed pursuant to

sufficiently similar standards of liability, such that the disposition of the claims should be

the same.  *Korte v. Diemer*, 909 F.2d 954, 957 (6th Cir. 1990).

Therefore, as a genuine issue of material fact exists as to Plaintiff's EPA claim,

Plaintiff's Ohio state law claims pursuant to O.R.C. §§ 4111.07 and 4112.02 are not

appropriate for summary judgment at this time.

Accordingly, the March 17, 2008 Motion of Defendant for Summary Judgment

(Doc. 20) is hereby **DENIED.**

**IT IS SO ORDERED.**

Michael H. Watson, Judge
United States District Court

**Plaintiff's Employment with Defendant (Exhibit A)**

| Date | Position | Annual Salary | Stock Options | Additional Incentive Plans |
|---|---|---|---|---|
| August 1999 | Promotion to Supervisor of Financial Reporting | | 2000 | |
| November 2000 | Promotion to Manager of Financial Reporting | $82,000 | 3,000 stock options received | |
| November 2002 | Manager of Financial Reporting | $88,500.00 | | |
| August 2003 | Manager of Financial Reporting | $95,000.00 | | |
| August 2003 | Promotion to Senior Manager of Financial Reporting | $110,000.00 | Additional 3,000 stock options received | Eligible to participate in the Company's Incentive Compensation ("IC") plan 10%[1] |
| March 2004 | Senior Manager of Financial Reporting | $110,000 | | |
| March 2005 | Senior Manager of Financial Reporting | $120,000.00. | 500 shares of restricted stock received | |
| March 2006 | Senior Manager of Financial Reporting | $126,000.00 | 500 shares of restricted stock received | |

[1] Eligibility into the IC plan meant that Plaintiff was eligible to receive a bonus of up to 10% of her base salary if the Defendant met certain financial benchmarks.

**Greg Hollern's Employment with Defendant (Exhibit B)**

| Date | Position | Annual Salary | Stock Options | Additional Incentive Plans |
|------|----------|---------------|---------------|----------------------------|
| September 1999 | Hired as Manager of SEC Reporting | $105,000 | 3000 stock options received | |
| March 2000 | Manager of SEC Reporting | | 1000 stock options received | |
| September 2000 | Manager of Accounting Operations, Sales Audit and Inventory Control | | | |
| March 2002 | Manager of Accounting Operations, Sales Audit and Inventory Control | | 1000 stock options received | |
| November 2002 | Manager of Accounting Operations, Sales Audit and Inventory Control | $110,000 | | |
| August 2003 | Promotion to Senior Manager of Sales Audit and Inventory Control. | $135,000. | 3,000 stock options received | Eligible to participate in IC program at 10% |
| March 2004 | Senior Manager of Sales Audit and Inventory Control. | $140,000 | 1,000 shares of restricted stock received | Eligible to participate in IC program at 10% |
| September 2004 | Promotion to Director of Store Control | $165,000. | | Eligible to participate in IC progarm at 15% |
| March 2005 | Director of Store Control | $169,000 | 500 shares of restricted stock received | |
| March 2006 | Director of Store Control | $177,500 | 700 shares of restricted stock received | |
| January 2007 | Promoted to Director of Accounting Operations. | | | |

**Dan Cutright's Employment with Defendant (Exhibit C)**

| Date | Position | Annual Salary | Stock Options | Additional Incentive Plans |
|---|---|---|---|---|
| August 2000 | Hired as a Senior Financial Analyst | $92,000 | 2000 stock options received | |
| March 2002 | Senior Financial Analyst | $96,000. | 1,000 stock options received | |
| March 2003 | Senior Financial Analyst | $103,000 | | |
| August 2003. | Promoted to Senior Financial Manager and/or Assistant Store Controller | $118,000 | 3,000 stock options received | Eligible to participate in IC program at 10% |
| March 2004 | Senior Financial Manager and/or Assistant Store Controller | $122,000 | 1,000 shares of restricted stock received | |
| September 2004 | Senior Manager of Sales Audit and Inventory Control. | $145,000 | | Eligible to participate in IC program at 15% |
| March 2005 | Senior Manager of Sales Audit and Inventory Control | $149,500 | 500 shares of restricted stock received | |
| March 2006 | Senior Manager of Sales Audit and Inventory Control | $162,000 | 850 shares of restricted stock received | |